## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT CARPENTER,** | : | **CIVIL ACTION NO. 1:18-CV-2155** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **YORK AREA UNITED FIRE AND** | : | |
| **RESCUE,** | : | |
| | : | |
| **Defendant** | : | |

### MEMORANDUM

Plaintiff Robert Carpenter filed this civil rights lawsuit against defendant York Area United Fire and Rescue ("YAUFR").  Carpenter alleges discrimination and retaliation in violation of the Americans with Disabilities Act and the Rehabilitation Act, as well as interference and retaliation under the Family and Medical Leave Act.  YAUFR moves for summary judgment on all claims.  (Doc. 27).

## I.    Factual Background and Procedural History[1]

YAUFR is an unincorporated, nonprofit association that was created to provide collaborative fire and rescue services to several townships in York County,

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  Id.  Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts.  (See Docs. 31, 41, 42).  To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the Rule 56.1 statements.

Pennsylvania.  (Doc. 41 ¶ 2).  YAUFR was initially formed in 2007 by Springettsbury and Spring Garden Townships, and in 2017 Manchester Township became a participating municipality.  (Id. ¶ 5; Doc. 29-1 at 22).  As stated in its charter, YAUFR's purpose is to provide "coordinated, integrated[,] and cost effective fire services" to its members.  (Doc. 29-1 at 22).  At all relevant times, YAUFR employed less than 50 employees.  (Id. at 51 ¶¶ 7-9; Doc. 41 ¶ 3; Doc. 42 at 1 ¶ 3).

Carpenter has been a firefighter in York County since 1997—first with Springettsbury Township and then with YAUFR.  (Doc. 41 ¶¶ 4-5).  Upon YAUFR's formation in 2007, Carpenter became an employee of, and received his paychecks from, this newly combined entity.  (Id. ¶¶ 6-7).  He was also a member of the Local 2377 International Association of Firefighters, which had a collective bargaining agreement with YAUFR.  (Id. ¶ 8).  Carpenter's professional duties included fire prevention and education, responding to emergency incidents and health-related emergencies, cleaning the firehouse, and studying.  (Id. ¶ 13).

On September 21, 2017, Carpenter was working a 24-hour shift when he awoke at 1:30 a.m. and began to experience a severe panic attack.  (Id. ¶¶ 12, 14).  He was eventually able to fall back to sleep and finish his shift ending at 8:00 a.m.  (Id. ¶ 15).  Later the same day, he visited his primary care physician, who provided a note stating that Carpenter would be "out of work indefinitely" but omitting any diagnosis, prognosis, or estimated date of return.  (Id. ¶¶ 17-18; Doc. 29-1 at 139).

Over the course of the following six months, the parties exchanged a series of communications regarding Carpenter's medical condition and continuing absence from work.  When Carpenter—without notice—did not appear for his next

scheduled shift on September 23, YAUFR sent him a letter indicating that it believed he had violated sick-leave policy and was scheduling a disciplinary hearing for October 3. (Doc. 41 ¶¶ 19-20). Carpenter responded with a letter from his primary care physician, addressed to YAUFR administrative director Lisa Einsig, stating that Carpenter was "recently diagnosed with a condition that is undergoing initial workup and treatment" and that he should be excused from the October 3 hearing for "medical reasons." (Id. ¶ 21; Doc. 29-1 at 143). The letter further explained that Carpenter had a follow-up appointment on October 5 and was "in the process of filing FMLA paperwork." (Doc. 29-1 at 143).

Carpenter formally requested leave under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*, shortly thereafter. According to Carpenter's deposition testimony, the FMLA paperwork was initially provided by YAUFR and picked up and returned by his wife. (Doc. 29-1, Ex. G, Carpenter Dep. 49:14-20, 66:8-12 ("Carpenter Dep.")). In a letter dated October 11, 2017, YAUFR denied Carpenter's FMLA leave request. (Doc. 41 ¶ 23; Doc. 29-1 at 145). YAUFR explained that, although it was a covered employer under the FMLA, it did not employ the requisite number of people for Carpenter to be considered an "eligible employee" under FMLA regulations. (Doc. 29-1 at 145 (citing, *inter alia*, 29 C.F.R. § 825.110)). YAUFR concluded that Carpenter's leave would instead "be handled in accordance with YAUFR leave policies." (Id.) It sent a separate certified letter the same day ordering Carpenter to provide "a medical update as to whether [he] will be able to return to employment as a fire fighter in the foreseeable future." (Doc. 41 ¶ 24; Doc. 29-1 at 147-48, 150). It further ordered Carpenter to furnish a medical

opinion regarding whether he could attend a disciplinary hearing and, if not, a detailed explanation from his doctor about why he was not medically able to attend. (Doc. 29-1 at 147-48).

YAUFR sent another certified letter to Carpenter on November 6.  (Doc. 41 ¶ 25).  This letter stated that no response had been received following YAUFR's October 11 correspondence, despite (1) receiving certified-mail confirmation that Carpenter had accepted the letter, and (2) placing a follow-up telephone call to him on October 30 and leaving a message.  (Id.; Doc. 29-1 at 150, 155).  YAUFR ordered Carpenter to respond within five days to schedule a meeting and to "provide information regarding [his] ability to return to employment as a firefighter in the foreseeable future." (Doc. 29-1 at 151).

YAUFR received no response, so it wrote Carpenter again on November 25, this time informing him that, due to his refusal to comply with previous orders and to provide updated medical information, he was found to be insubordinate and in violation of departmental policies.  (Doc. 41 ¶ 26; Doc. 29-1 at 153).  The November 25 correspondence also scheduled a disciplinary hearing for December 11 at YAUFR headquarters.  (Doc. 29-1 at 153).  The same day, YAUFR mailed an additional certified letter renewing its request for Carpenter to update his "status and anticipated ability to return to duty."  (Id. at 155).

On December 7, Carpenter's primary care physician provided a brief note to YAUFR indicating that Carpenter had been seen on November 29, had another appointment scheduled for December 20, "needs to remain out of work until his next appointment," and "is unable to work at this time in any capacity." (Doc. 41

¶ 28; Doc. 29-1 at 158).  Carpenter did not appear for the December 11 disciplinary hearing.  (Doc. 41 ¶ 30).  On January 2, 2018, the same physician sent a nearly identical letter to YAUFR (altering only the appointment dates), indicating that Carpenter needed to remain off work until at least January 10 and was unable to work "in any capacity."  (Doc. 41 ¶ 31; Doc. 29-1 at 160).

YAUFR mailed another pair of letters to Carpenter on January 5, once more indicating that Carpenter was insubordinate, must appear for a disciplinary hearing (rescheduled to January 16), and must provide a status update concerning his medical condition and when he might be able to return to duty.  (Doc. 41 ¶¶ 33-34; Doc. 29-1 at 162, 165-66).  Carpenter's physician responded to YAUFR with a January 10 letter identical in format and substance to the two previous letters, stating that Carpenter needed to remain off work until his next appointment on February 7 and was unable to work in any capacity.  (Doc. 41 ¶ 35; Doc. 29-1 at 168).

YAUFR then sent a series of certified letters to Carpenter on January 25, February 13, and March 5.  (Doc. 41 ¶¶ 36-38).  This correspondence likewise ordered medical-status updates, alleged that Carpenter's repeated failure to respond to orders constituted insubordination, and outlined Carpenter's failure to perform in accordance with YAUFR policy.  (See Doc. 29-1 at 170-80).  The letters also explained that Carpenter would be subject to a two-week suspension without pay upon his return to active duty and may face termination if he continued to ignore orders and scheduled hearings without adequate medical excuses.  (Id. at 173, 177, 180).  YAUFR acknowledged receipt of the letters from Carpenter's physician regarding inability to work, but found that such minimal correspondence

did not excuse Carpenter's failure to communicate, attend scheduled meetings and hearings, or provide medical-status information as ordered.  (Id. at 172).  The March 5 letter scheduled a "Loudermill disciplinary hearing" for March 12 to discuss Carpenter's repeated failure to obey direct orders and to give Carpenter an opportunity to present "any defenses/excuses/mitigating circumstances" concerning potential discipline that could include termination.  (Id. at 179-80).

It appears that Carpenter's only response to YAUFR's warnings was another identical note from his primary care physician.  This March 7 correspondence again listed Carpenter's prior and upcoming appointment dates, stated that Carpenter "is unable to work in any capacity at this time," and opined that he should remain out of work until reevaluation on April 9.  (Doc. 41 ¶¶ 39-40; Doc. 29-1 at 182).

YAUFR held the March 12 disciplinary hearing as scheduled despite Carpenter's absence.  (Doc. 41 ¶ 41).  Ten days later, YAUFR sent Carpenter a detailed letter outlining seven alleged instances of insubordination, repeated failure to provide requested medical information and adequate medical excuses for scheduled meetings and hearings, and other various instances of failing to perform as ordered.  (Id.; Doc. 29-1 at 184-88).  The March 22 correspondence ultimately informed Carpenter that, effective March 23, 2018, his employment with YAUFR was officially terminated.  (Doc. 29-1 at 188).

Carpenter alleges that he filed a charge of employment discrimination with the Equal Employment Opportunity Commission in June 2018, and that the

commission issued a right-to-sue letter on August 9, 2018.  (Doc. 1 ¶¶ 16, 18).[2]  On

November 7, 2018, Carpenter filed the instant lawsuit asserting discrimination and

retaliation under the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 701 *et seq.*

(Count I); discrimination and retaliation under the Americans with Disabilities Act

of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* (Count II); and FMLA interference and

retaliation (Count III).[3]  YAUFR moves for summary judgment on all claims.  The

motion is fully briefed and ripe for disposition.

## II.   **Legal Standard**

Through summary adjudication, the court may dispose of those claims

that do not present a "genuine dispute as to any material fact" and for which a

jury trial would be an empty and unnecessary formality.  FED. R. CIV. P. 56(a).

The burden of proof tasks the non-moving party to come forward with "affirmative

evidence, beyond the allegations of the pleadings," in support of its right to relief.

Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex

Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The court is to view the evidence "in

the light most favorable to the non-moving party and draw all reasonable inferences

---

[2] YAUFR summarily denies these allegations in its answer, (see Doc. 9 ¶¶ 16, 18), and Carpenter has provided no evidence to support his assertions.  YAUFR, however, does not raise this lack of exhaustion evidence as a basis for summary judgment.

[3] Carpenter also alleged that he cross-filed with the Pennsylvania Human Relations Commission and would move to amend his complaint once his state-law employment discrimination claims ripened.  (See Doc. 1 ¶¶ 17, 20).  Carpenter has proffered no such amendment to date, so we confine our discussion to federal claims only.

in that party's favor." <u>Thomas v. Cumberland County</u>, 749 F.3d 217, 222 (3d Cir.

2014).  This evidence must be adequate, as a matter of law, to sustain a judgment in

favor of the non-moving party on the claims.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477

U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S.

574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed.

<u>See</u> <u>Pappas</u>, 331 F. Supp. 2d at 315.

## III.   **Discussion**

We note at the outset that Carpenter has provided no independent evidence

to oppose YAUFR's motion for summary judgment.  He instead relies entirely on

his pleadings and the factual record submitted by YAUFR.  We further observe that

Carpenter misapprehends the standard of review at the current procedural

juncture, repeatedly arguing that his bare allegations must be taken as true and are

sufficient to carry his summary judgment burden.  (<u>See</u> Doc. 30-2 at 10, 12, 15, 16,

18).  Of course, the standard is to the contrary: "[t]he non-moving party cannot rest

on mere pleadings or allegations; rather it must point to actual evidence in the

record on which a jury could decide an issue of fact its way." <u>El v. SEPTA</u>, 479 F.3d

232, 238 (3d Cir. 2007) (citation omitted).  We nevertheless endeavor to determine

whether Carpenter has established a genuine issue of material fact such that

judgment for YAUFR is inappropriate.

### A.    **ADA and RA Discrimination Claims**

Claims of discrimination under the ADA and RA are generally analyzed

coextensively.  <u>See</u> <u>Berardelli v. Allied Servs. Inst. of Rehab. Med.</u>, 900 F.3d 104, 117

(3d Cir. 2018); <u>CG v. Pa. Dep't of Educ.</u>, 734 F.3d 229, 235 (3d Cir. 2013).  To make

out a *prima facie* case of discrimination pursuant to these statutes, a plaintiff must establish: (1) he has a disability; (2) he is a "qualified individual"[4]; and (3) the defendant discriminated against him because of his disability.  See Furgess v. Pa. Dep't of Corr., 933 F.3d 285, 288-89 (3d Cir. 2019) (citing Chambers *ex rel.* Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 189 n.19 (3d Cir. 2009)).  In the employment context, the third prong often requires showing an "adverse employment action" taken by the employer because of the plaintiff's disability.  See Buskirk v. Apollo Metals, 307 F.3d 160, 166 (3d Cir. 2002).  One significant difference between ADA and RA discrimination claims is that, for RA claims, disability must be the sole cause of the discrimination, whereas the ADA only requires "but-for" causation.  Furgess, 933 F.3d at 291 n.25; CG, 734 F.3d at 236 n.11.

Another relevant distinction between the ADA and the RA is that, to succeed on an RA claim, the plaintiff must establish that the discriminating entity receives federal funding.  See CG, 734 F.3d at 235 n.10; Chambers, 587 F.3d at 189 n.20. Carpenter alleges twice in his complaint that YAUFR receives federal funding, (see Doc. 1 ¶¶ 4, 64), but YAUFR denies these factual allegations (albeit with the inaccurate assertion that they are "conclusions of law"), (see Doc. 9 ¶¶ 4, 64). Because Carpenter has proffered no evidence that YAUFR receives federal funding, and none appears in the record, he simply cannot carry his Rule 56 burden on his

---

[4] Section 12111(8) of Title 42 of the United States Code defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m).

claims under the Rehabilitation Act.  See Celotex, 477 U.S. at 322-23; El, 479 F.3d at 238.  Our subsequent analysis, therefore, will necessarily be limited to ADA discrimination and retaliation.[5]

The burden of establishing a *prima facie* case "is not onerous," Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 365 (3d Cir. 2008) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)), and presents a "low bar" for employment discrimination plaintiffs, Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 539 (3d Cir. 2006) (citation omitted).  YAUFR challenges all three *prima facie* elements of Carpenter's ADA discrimination claim. We need only analyze two.

### 1.   *Disability*

YAUFR first argues that summary judgment must be granted in its favor because Carpenter has not established that he is disabled or that any disability was made known to YAUFR.  Carpenter responds that his "crushing depression and anxiety" clearly qualify as an actual disability under the ADA.  (Doc. 30-2 at 10).

"Disability" under the ADA is defined as "a physical or mental impairment that substantially limits one or more major life activities" of an individual, a "record of such impairment," or "being regarded as having such an impairment."  42 U.S.C. § 12102(1); see McFarlan v. Ivy Hill SNF, LLC, 675 F.3d 266, 274 (3d Cir. 2012). Congress specifically intended that "disability" be interpreted broadly.  See 42

---

[5] We note, however, that because RA and ADA claims are often analyzed "in the same breath," Berardelli, 900 F.3d at 117 (citation omitted), the substantive deficiencies with Carpenter's ADA claims apply equally to his RA claims.

U.S.C. § 12102(4)(A) ("The definition of disability . . . shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter."). Short-term impairments that last for less than six months may qualify as disabilities, so long as they substantially limit a major life activity. See 29 C.F.R. § 1630.2(j)(1)(ix).

One problem for Carpenter is the dearth of record evidence regarding his alleged disability. He has provided no medical records or expert reports, and none of his treating physician's correspondence to YAUFR contains a diagnosis or even references Carpenter's symptoms. The letters simply say that he is unable to work, but do not specify whether Carpenter was unable to work as a firefighter or was unable to perform any type of work. The mere inability to work as a firefighter likely would not qualify as a "disability" within the meaning of the ADA. See Tice v. Centre Area Transp. Auth, 247 F.3d 506, 512-13 (3d Cir. 2002) (noting that bus driver's inability to drive bus but ability to perform other jobs did not qualify as substantial limitation on major life activity of "working").

The only other available evidence is Carpenter's deposition, although Carpenter neither references this testimony nor points to portions thereof that would support his *prima facie* case. Upon independent review, we observe the following pertinent details. Carpenter testified that he began dealing with depression in 2013, which flared in August 2017 and required a return to therapy. (Carpenter Dep. 27:1-24, 28:20-29:6). On September 21, 2017, he experienced a "mental breakdown" manifesting in severe anxiety and a panic attack. (Id. at 34:11-12, 36:9-14; Doc. 42 at 7 ¶¶ 2-3). That day he began treating with his primary care

physician, increased the frequency of his therapy sessions, and began a series of medications including Venlafaxine.  (Carpenter Dep. 51:4-23).  According to Carpenter, in addition to depression, he was also diagnosed with acute, stress-induced anxiety and post-traumatic stress disorder ("PTSD").  (Id. at 51:24-52:18, 53:1-11).  Carpenter also testified that he experienced involuntary, stress-induced "flailing," for which he was prescribed Primidone.  (Id. at 61:11-62:12).  Following termination from YAUFR, his depression worsened and resulted in several involuntary hospitalizations as well as treatment with electroconvulsive therapy. (Id. at 69:3-70:23, 72:13-73:21).

Carpenter's testimony regarding his severe depression, anxiety, and PTSD, bolstered by his doctor's correspondence indicating that Carpenter was unable to work, is adequate for a reasonable juror to conclude that Carpenter suffered from an impairment that substantially limited the major life activity of "working."  See 42 U.S.C. § 12102(1)(A), (2)(A).  Carpenter thus satisfies the "low bar" for establishing the first element of his *prima facie* case of discrimination.  See Scheidemantle, 470 F.3d at 539.

### 2.    *Qualified Individual*

YAUFR next argues that Carpenter is not a qualified individual for ADA purposes because he could not perform the essential functions of his job with or without reasonable accommodation.  We agree.

The parties stipulate that Carpenter's job duties included fire prevention, fire education, emergency response, cleaning the firehouse, and studying.  Carpenter concedes, as he must, that during the time in question—September 21, 2017, to the

end of March 2018—he could not perform these job functions without reasonable accommodation.  Carpenter's medical excuses plainly state that he could not work in any capacity, and Carpenter never returned to work following his September 21, 2017 panic attack and eventual termination from YAUFR.  (See Carpenter Dep. 22:17-20, 71:15-17).  Indeed, Carpenter applied for, and received, federal Supplemental Security Income benefits due to his significant and prolonged mental-health impairment.  (Id. at 22:17-23:13).

Carpenter contends that he required extended medical leave to recover and that such leave would be a reasonable accommodation.[6]  (Doc. 30-2 at 11-12; Doc. 42 at 7 ¶ 46).  Assuming Carpenter adequately communicated this proposed accommodation to YAUFR, he is incorrect that such an accommodation is reasonable.

It is true that, in certain circumstances, a leave of absence may be a reasonable accommodation under the ADA.  See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 151 (3d Cir. 2004).  However, that leave cannot be indefinite or open-ended; there must be some expectation that the employee could perform his essential job functions in the "near future" following the requested leave.  See id.; Fogelman v. Greater Hazelton Health All., 122 F. App'x 581, 585 (3d Cir. 2004)

---

[6] At one point during his deposition, Carpenter suggested that the only accommodation that would have helped would be if YAUFR "got rid of the entire administration and replaced them with all new people."  (Carpenter Dep. 65:1-14).  This proposed "accommodation," in addition to being facially unreasonable and impractical, has been disclaimed by Carpenter's counsel as an "off-the-cuff" response having "no legal import."  (Doc. 42 at 7 ¶ 46).

(nonprecedential); <u>Garner v. Sch. Dist. of Phila.</u>, 63 F. Supp. 3d 483, 492 (E.D. Pa. 2014) (citations omitted).

There is no record evidence indicating that Carpenter could have returned to his position at YAUFR in the "near future" following his request for FMLA leave— the only medical leave request Carpenter made to YAUFR. To the contrary, all evidence indicates that Carpenter was completely disabled and had no idea when he might be able to work again. Carpenter explicitly admits that his severe depression "was not a predictable condition determinative of a cure date," (Doc. 42 at 7 ¶ 45), and that he could not return to work "for an indefinite period," (<u>id.</u> at 8 ¶ 5). Carpenter also eventually applied for, and received, Supplemental Security Income benefits due to his prolonged disability.

Such indefinite leave, with no ascertainable duration, is not a reasonable accommodation under the ADA. <u>Fogelman</u>, 122 F. App'x at 585-86 (collecting cases). And because Carpenter's proposed accommodation is unreasonable as a matter of law, he is not a "qualified individual." <u>See</u> <u>Gaul v. Lucent Techs., Inc.</u>, 134 F.3d 576, 581 (3d Cir. 1998). Thus, we need not analyze the third element of Carpenter's *prima facie* case. Carpenter unquestionably fails to establish that he was a qualified individual, which is fatal to his ADA discrimination claim.

### B.     ADA Retaliation

A *prima facie* case of retaliation under the ADA requires a plaintiff to show that (1) he engaged in a protected activity; (2) he suffered an adverse employment action after or contemporaneous with the protected conduct; and (3) a causal link exists between the protected activity and the adverse action. <u>E.E.O.C. v. Allstate</u>

Ins. Co., 778 F.3d 444, 449 (3d Cir. 2015) (ADA).  Unlike an ADA discrimination claim, a plaintiff claiming retaliation need not establish that he is a "qualified individual with a disability."  Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 188 (3d Cir. 2003) (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 498 (3d Cir. 1998)).

Carpenter's entire retaliation argument consists of three sentences and cites no evidence.  (See Doc. 30-2 at 16).  He contends that (1) his "allegation of protected activity was his request for medical leave"; (2) this request was made before his termination; and (3) "it is clear . . . that he was disciplined as a result of this request and that he suffered from an adverse action" following or contemporaneous with his "request for an accommodation."  (Id.)  Such conclusory statements unsupported by record evidence fall well short of what is required at summary judgment.

The only protected activity Carpenter identifies is his request for FMLA leave, which YAUFR denied based on the number of its employees.  Requesting FMLA leave is protected conduct, but it is generally protected by antiretaliation provisions of the FMLA.  See Erdman v. Nationwide Ins. Co., 582 F.3d 500, 508-09 (3d Cir. 2009); 29 U.S.C. § 2615(a)(2); 29 C.F.R. § 825.220(c).  Count III of the instant complaint, in fact, asserts a claim for FMLA retaliation.  Nevertheless, the Third Circuit has held that "a request for FMLA leave may qualify, under certain circumstances, as a request for reasonable accommodation under the ADA."  Capps v. Mondelez Glob., LLC, 847 F.3d 144, 156-57 (3d Cir. 2017) (citation omitted).

We assume, *arguendo*, that Carpenter's request for FMLA leave satisfies those "certain circumstances" and can be construed as a good-faith request for reasonable accommodation.  Still, YAUFR is correct that Carpenter has failed to establish the requisite causal connection to the adverse employment actions.  Carpenter does not directly address causation but appears to infer that causation is shown purely by timing.

Whether there is a causal nexus between the protected activity and the adverse action is a totality-of-the-circumstances inquiry.  <u>Daniels v. Sch. Dist. of Phila.</u>, 776 F.3d 181, 196 (3d Cir. 2015).[7]  A plaintiff asserting retaliation may rely solely on temporal proximity between the protected conduct and the adverse action to create an inference of causation, but only if the timing is "unusually suggestive" of a retaliatory motive.  <u>Id.</u> (quoting <u>LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n</u>, 503 F.3d 217, 232 (3d Cir. 2007)).  Absent such suggestive timing, courts consider "any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting" a retaliatory animus.  <u>Id.</u> (citations omitted).

The adverse actions Carpenter identifies are "discipline" and termination. (Doc. 30-2 at 16).  We are unsure exactly what Carpenter's broad allegation of discipline refers to, but assume he means being docked 24 hours of pay and the two-

---

[7] <u>Daniels</u> involves retaliation under the Age Discrimination in Employment Act ("ADEA"), but "precedent interpreting any one of these statutes [ADA, ADEA, Title VII] is equally relevant to interpretation of the others."  <u>E.E.O.C.</u>, 778 F.3d at 449.

week, unpaid suspension that was to be imposed upon his return to duty.  (See Doc. 42 at 11 ¶ 28).

Neither instance of discipline raises an inference of retaliatory animus.  The docking of 24 hours of pay was related to Carpenter's failure to come to work on September 23 or to provide notice of his absence.  This disciplinary action, however, was contemplated and discussed *before* Carpenter submitted his FMLA leave request.  (See Doc. 29-1 at 141).  Moreover, YAUFR did not ultimately impose either punishment until after it had issued numerous written warnings regarding sick-leave compliance and held a formal hearing on January 16, 2018.  (See id. at 170-73).  None of this timing is "unusually suggestive" or otherwise raises an inference of retaliatory motive.

Finally, Carpenter's termination took place over five months after his request for FMLA leave, and it was preceded by an extensive course of written warnings and attempted hearings by YAUFR.  A five-month span between a request for leave and termination, without more, is not unusually suggestive of retaliatory animus. See LeBoon, 503 F.3d at 233 (three-month gap between protected activity and adverse action not unusually suggestive); Andreoli v. Gates, 482 F.3d 641, 650 (3d Cir. 2007) (five-month gap insufficient).  This is especially true considering YAUFR's intervening attempts to obtain more information from Carpenter about his condition and possible return date.  Assuming Carpenter engaged in protected activity, which is substantially in doubt, he has failed to make a *prima facie* showing of causation for his ADA retaliation claim.

### C.      FMLA Interference and Retaliation

YAUFR attacks Carpenter's claims for FMLA interference and retaliation on multiple fronts.  It posits that, because Carpenter is not an "eligible employee" under the FMLA and its implementing regulations, he cannot maintain an action for interference or retaliation.  YAUFR also asserts that Carpenter cannot make out a *prima facie* case of interference or retaliation and would likewise fail at the burden-shifting stage even if he could establish a *prima facie* retaliation case.

### 1.      *FMLA Interference*

The FMLA only applies to certain employers and employees.  <u>See</u> <u>generally</u> 29 U.S.C. § 2611(2), (4).  YAUFR admits that, because it is a public agency, it is an "employer" within the meaning of the statute.  <u>See</u> <u>id.</u> § 2611(4)(A)(iii); <u>see</u> <u>also</u> <u>id.</u> § 203(x); 29 C.F.R. §§ 825.104(a), .108(a), .108(d).  This condition, however, is only half the equation.  The employee seeking benefits under the FMLA must also be an "eligible employee."  <u>See</u> 29 U.S.C. § 2611(2); 29 C.F.R. §§ 825.108(d), .110(a).

To qualify as an "eligible employee," the employee must be "employed at a worksite where 50 or more employees are employed by the employer within 75 miles of that worksite."  29 C.F.R. § 825.110(a)(3); <u>see</u> 29 U.S.C. § 2611(2)(B)(ii).  YAUFR avers, and Carpenter concedes, that YAUFR has never employed 50 or more people.  (Doc. 29-1 at 51 ¶¶ 7-9; Doc. 41 ¶ 3; Doc. 42 at 1 ¶ 3).

Nonetheless, Carpenter maintains that he is still eligible for FMLA benefits. He argues that the employee count should not be limited to YAUFR's employees but should include the municipalities that "restructure[d]" their fire departments in a "purely technical" move to create YAUFR.  (Doc. 30-2 at 16-17).  Carpenter also

contends that the collective bargaining agreement contractually obligates YAUFR to provide FMLA benefits to its employees.  Neither assertion is persuasive.

Carpenter's employee-count argument encounters two insurmountable hurdles.  First, Carpenter has admitted that YAUFR is his employer.  (See Doc. 41 ¶ 6; Doc. 42 at 1 ¶ 6).  More importantly, even if he could somehow circumvent this admission to contend that his "employer" is actually one or all of the municipalities that created YAUFR, Carpenter has not sued any of those entities.

The collective bargaining agreement references the FMLA only once in a single sentence in the employee sick-leave section.  It states, "However, *if* leave is *qualifying* FMLA leave, the employee shall use paid leave during the FMLA leave period."  (Doc. 29-1 at 114 (emphasis added)).  Nothing in this sentence establishes or even implies a contractual obligation to provide FMLA benefits to YAUFR employees regardless of their eligibility.

There is no genuine dispute that YAUFR is Carpenter's employer and that YAUFR does not employ the requisite 50 employees; hence, Carpenter is not an "eligible employee" under the FMLA.  See 29 C.F.R. § 825.110(a)(3); 29 U.S.C. § 2611(2)(B)(ii).  Because the first element of an FMLA interference claim is that that the claimant is an eligible employee, Capps, 847 F.3d at 155, Carpenter's FMLA interference claim fails.

### 2.  *FMLA Retaliation*

Carpenter's FMLA retaliation claim is less straightforward.  It does not appear that the Third Circuit has directly addressed whether a plaintiff asserting a retaliation claim under the FMLA must be an "eligible employee" entitled to FMLA

rights.  Other circuits have concluded that a retaliation claimant must have been an eligible employee qualified for FMLA leave when the retaliation-inducing leave was taken or requested.  See Pagel v. TIN Inc., 695 F.3d 622, 631 (7th Cir. 2012); Humenny v. Genex Corp., 390 F.3d 901, 904-06 (6th Cir. 2004); Walker v. Elmore Cty. Bd. of Educ., 379 F.3d 1249, 1253 (11th Cir. 2004).  At least one district court in this circuit has agreed with these decisions, emphasizing that the request for FMLA leave must be "valid."  See Hansler v. Lehigh Valley Health Network, No. 13-CV-3924, 2014 WL 1281132, at *12-13 (E.D. Pa. Mar. 28, 2014), rev'd on other grounds sub nom., Hansler v. Lehigh Valley Hosp. Network, 798 F.3d 149 (3d Cir. 2015).

Generally, FMLA retaliation claims are filed by employees who personally sought FMLA leave and subsequently faced an adverse employment action because of doing so.  In such circumstances, our court of appeals has signaled that it would require the retaliation claimant to be an eligible employee when requesting FMLA leave.  See Bonkowski v. Oberg Indus., Inc., 787 F.3d 190, 195 (3d Cir. 2015); Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 301-02 (3d Cir. 2012); Erdman, 582 F.3d at 509.  In Lichtenstein, for example, the Third Circuit identified the first element of the plaintiff's FMLA retaliation claim as requiring her to have "invoked her right to FMLA-qualifying leave."  Lichtenstein, 691 F.3d at 301-02 (emphasis added).  And in Erdman, the court noted that firing an employee for a

"*valid* request for FMLA leave" may constitute retaliation.  Erdman, 582 F.3d at 509

(emphasis added).[8]

We decline to delve more deeply into this issue because we need not.  Even if

we assume that Carpenter could bring a claim for FMLA retaliation without being

an eligible employee, his claim would suffer from the same infirmity as his ADA

retaliation claim.  That is, he has not made a *prima facie* showing of causation.  The

protected activity alleged in this claim is the same protected conduct Carpenter

proffered for his ADA retaliation claim—requesting FMLA leave.  And because the

facts and circumstances regarding indicia of retaliatory animus (or, more

appropriately, lack thereof) also remain unchanged, the lack of causal connection

fatal to Carpenter's ADA retaliation claim necessarily dooms his FMLA retaliation

claim.  See *supra* Section III(B).[9]

---

[8] The text of the FMLA does not expressly mention "retaliation."  The regulation that explicitly refers to retaliation seems to imply an "eligible employee" requirement.  See 29 C.F.R. § 825.220(c) ("The Act's prohibition against interference prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights.").  The Third Circuit has identified this regulation as the basis for FMLA retaliation claims.  See Egan v. Del. River Port Auth., 851 F.3d 263, 269 (3d Cir. 2017); Erdman, 582 F.3d at 508 & n.3.  The Department of Labor, however, has explained that Section 825.220(c) flows from 29 U.S.C. § 2615(a)(1) and, consequently, the Third Circuit has not had the opportunity to address the scope of the retaliation protections provided in Section 2615(a)(2).  See Egan, 851 F.3d at 270 & n.3.

[9] We reach this conclusion despite recognizing that FMLA retaliation claims—unlike ADA retaliation claims—do not require "but-for" causation and instead only necessitate a showing that "the use of FMLA leave was a 'negative factor' in the adverse employment decision."  DiFiore v. CSL Behring, LLC, 879 F.3d 71, 78 (3d Cir. 2018) (citing Egan, 851 F.3d at 273).  To be abundantly clear, Carpenter has not adduced evidence to meet even this "lessened causation standard."  Egan, 851 F.3d at 273 (citation omitted).

IV.     **<u>Conclusion</u>**

Carpenter's claims of disability discrimination and retaliation, as well as

FMLA interference and retaliation, cannot withstand Rule 56 scrutiny.  We will

therefore grant YAUFR's motion for summary judgment in its entirety.  An

appropriate order shall issue.


                                        /S/ CHRISTOPHER C. CONNER
                                        Christopher C. Conner, Chief Judge
                                        United States District Court
                                        Middle District of Pennsylvania

Dated:     April 17, 2020